Filed 6/29/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069445 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1301449) |
| KIESHA RENEE SMITH et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Bernardino County, R. Glenn Yabuno, Judge. Reversed.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant Kiesha Renee Smith.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant Michael Mitchell.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry J. Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendants Kiesha Renee Smith and Michael Mitchell appeal from their judgments of conviction for the murder of Josephine Kelley.  We are compelled to reverse both defendants' convictions due to prejudicial error in the joint trial before separate juries.[1]

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

1.    *General background*

Josephine Kelley was 90 years old in 2005.  She lived with her daughter Susan Hassett, son-in-law Dennis Hassett, and grandson Derrick Hassett.[2]

Derrick was unemployed and lived with his parents.  Derrick sold drugs and often accepted electronic gadgets as payment in exchange for drugs.  Sherry Beck used drugs, including marijuana and methamphetamine, and was a customer of Derrick's.  She would sometimes pay him money for the drugs, but other times would trade items, such as "cell phones, DVD players, different things," for drugs.  Beck occasionally used methamphetamine with Derrick.[3]

---

[1]    Although a joint trial was held, the defendants had separate juries.  The evidence that the two juries heard differed in some respects.

[2]    We refer to the Hassetts by their first names when necessary for clarity.

[3]    Beck was initially charged along with Smith and Mitchell in this case.  She entered into a plea agreement with the District Attorney in which she pled guilty to lesser

Beck spent time with other people who used drugs and stole things, as well. Beck would sometimes pawn stolen items at pawn shops for other people. Beck had been convicted of burglarizing her mother's home.

Beck knew Smith because they lived in the same apartment complex, which was not far from the Hassett home.[4] Beck sometimes gave Smith rides in Beck's car. One day in September 2005, Beck drove Mitchell and Smith to a pawn shop.

As Beck, Smith and Mitchell drove by Derrick's house, Beck pointed out the Hassett residence to Mitchell and Smith and told them that they could probably acquire a lot of items from the home because Derrick was frequently getting items of value, such as electronics, in exchange for drugs. Beck specifically identified Derrick's house because she was upset with him and wanted to get even with him. Beck had begun to feel that Derrick had been taking advantage of her by giving her less product than what she believed she was entitled to receive in exchange for the merchandise she was giving Derrick.

According to Beck's trial testimony, Mitchell and Smith developed a plan in which they would have Beck get Derrick to leave the house so that they could burglarize it.

---

offenses, which carried a potential prison term of 17 years, in exchange for providing truthful testimony against Smith and Mitchell.

[4]     When Beck was interviewed about the crime by police investigators, she did not refer to Smith by name, but instead referred to her as "Rhonda's daughter." Beck told a detective that she did not know Smith's name. Beck also said that she did not know Mitchell's name, and knew only that he was Smith's boyfriend.

## 2. *The day of the murder*

On September 15, 2005, Beck drove to Derrick's house and tried to trade a CD player or power tools for drugs.[5] Derrick was in the garage of the home, and he and Beck met there. Derrick did not have any drugs to give Beck. Beck thought Derrick was acting strangely; he seemed as if he were high on drugs. Derrick later admitted that he might have ingested drugs that morning.

During their visit in Derrick's garage, Beck learned that Derrick's grandmother was at home. Beck attempted to get Derrick to leave to get some drugs, but Derrick declined to leave the house because he did not feel that Beck had anything to trade that was sufficiently valuable for him to take the time to go get more drugs.

While Beck was talking to Derrick, Smith approached the house on foot and pretended to be looking for a lost kitten.[6] According to Derrick, Beck and Smith "started

---

[5] Beck was unclear as to what time she had been at the Hassett home that day. Originally, during an interview with a detective, Beck said that she had been at the home at around 10:00 or 11:00 in the morning, and that she was certain that she had been there in the morning. However, she recalled seeing a mailman while she was there, and, based on the detective noting that she could have only seen the mailman if she had been there in the afternoon, Beck ultimately agreed with the detective that she must have been at the Hassett home at around 3:00 p.m. The detective indicated that Beck "really had . . . difficulty with time." At trial, however, in responding to a question that was not specifically about the timing of her visit to Derrick's house, Beck said that she went over to Derrick's house in the "morning." Yet, when pressed to recall when she arrived at Derrick's house that day, Beck said that she did not remember.

[6] At trial, Derrick was less-than-convincing in his identification of Smith. When asked whether he saw "the person who came to the house that day and started arguing with Sherry here in court today," Derrick responded, "Maybe, yes." When pressed with the question, "Do you or don't you?" Derrick said, "Yeah. I guess so, yeah." When asked whether he could point the person out and describe what the person was wearing, Derrick said, "I think it might be her right there," gesturing toward Smith.

4

arguing" about "their cat or something." Beck tried to motion to Smith for "her [to] go away." Smith eventually left. According to Beck, she did not stay "long" after Smith left. At some point, Derrick's friend Christopher Mahan showed up to "smoke . . . some dope" with Derrick.

According to Mahan, Derrick and Mahan "smoke[d] . . . some dope" at the Hassett home.[7] Derrick then "got all paranoid" and decided that they needed to leave the house. Derrick and Mahan went inside to close and check or lock all of the windows and doors. Derrick said, " 'Bye grandma, love you.' " Mahan heard no response. The two then left to go to a store to get beer. After they got some beer, Mahan dropped Derrick off at a friend's house up the street from where Derrick lived, and Mahan "went straight back to work."

In the meantime, after leaving the Hassett home in her own car, Beck saw Smith, Mitchell, and another man in a car that pulled up next to hers.[8] Both drivers pulled over, and Beck told the occupants of the other car that she did not want to have anything to do with burglarizing the Hassett home. Beck testified, "I showed 'em the house, and to me that was all I wanted to be involved with." Beck claimed that she told Smith, Mitchell and the other man that she did not want any of the money or property that they might get from the Hassett house, and that her only goal was to "get[ ] even with Eric — I mean

---

[7]     Derrick testified that he and Mahan did not use any drugs or drink any alcohol before leaving the house together.

[8]     During an interview with a detective in January 2013, Beck said that she had walked to the Hassett house and eventually walked back to the Checkmates apartment complex.

5

Derrick." According to Beck, she told Smith and Mitchell that Derrick's grandmother was at home, and that she did not want them to burglarize the house. Smith and Mitchell did not say anything in response. Beck then returned to the apartment complex, although she was not living there at that time.[9]

Susan Hassett returned home from work that afternoon sometime after 3:30 p.m. Upon entering her home, she saw "[her] mother's purse open, laying on the floor, and everything spread out around it from the contents of her purse." Susan began to call out for her mother. Susan immediately went to her mother's bedroom and found Kelley on her bed. There was a pillowcase over Kelley's head. Susan took the pillowcase off of her mother's head and tried to wake her up. Susan called 911.

It was later determined that Kelley had died from homicidal asphyxia. Her legs and arms had been bound with wires used "for hooking up televisions, monitors or computer monitors." The medical examiner testified that he "felt that the primary method or mode of asphyxiation here was smothering," but that "[t]he position she was in [i.e., the way 'she was lying'] might have contributed to her death."

Later that day, Mahan returned to the place where he had dropped Derrick off, and picked him up. Mahan told Derrick that there were police at Derrick's house. Mahan took Derrick to the police station, where he spent a number of hours.[10] Derrick was

---

[9]  Beck had friends who were still living in the apartment complex.

[10]  Derrick and Mahan provided differing accounts of the timing of Mahan's return to pick up Derrick. Mahan testified that when he returned to get Derrick, it was dark out. Derrick testified that when Mahan picked him up and took him to the police station, it was still light out.

arrested for Kelley's murder that day. The investigation centered on Derrick in 2005, but the District Attorney's office ultimately declined to prosecute Derrick for the crime.

      3.     *Additional evidence*

Beck learned from the television news the following morning that Kelley had died. She saw Derrick "in a[n] orange jumpsuit."

According to Beck, on the day after the burglary of the Hassett home, Smith, Mitchell and the other man who had been in the car with them the previous day approached Beck in front of the hotel where she was staying. They told Beck that she "needed to keep [her] mouth shut." They were in an SUV, and one of them had a weapon.[11] Beck said that someone pointed the weapon at her.

Beck was interviewed by police a number of times, beginning shortly after Kelley's death. During her first interview, Beck told officers that she thought Smith might have been involved in Kelley's murder. Beck was given a photographic lineup, but was unable to positively identify Mitchell.

About three weeks to a month after Kelley's death, police went to the home of Mitchell's mother, Theresa Johns, looking for Smith.[12] Officers found Smith hiding in a

---

[11]    During this questioning, Beck never specified what type of "weapon" it was that she had seen. She said that she thought that "it was black." On cross-examination, counsel asked Beck whether she had earlier said that she had been threatened with a gun, specifically. Beck responded that either Mitchell "or the guy that was riding with him" had pointed a gun at her.

[12]    The San Bernardino police officer who testified about the search of Johns's residence did not indicate why officers were looking for Smith.

7

closet. While at the residence, police found a significant number of items that had been taken from the Hassett residence. It also became clear that Smith and Mitchell had pawned, within days of the burglary, other items of value that had been stolen from the Hassett residence. Many of the stolen items found in Johns's residence were identifiable as having been taken during the burglary of the Hassett residence, including jewelry and watches, some of which had personalized engravings. Police also found foreign currency and many coins, including coin collections.

Police searched a Chevy Blazer that was parked at Johns's house. Inside the Blazer, a detective found a small safe and a pink tackle box, which officers suspected were also connected to the burglary of the Hassett residence. Inside the safe an officer found collectible coin books containing collections of coins and currency from different countries, and inside the tackle box officers found jewelry and money.

During an interview with police in early 2006, Derrick was presented with photographic lineups. In the lineup in which police placed Smith's photograph, Derrick was unable to positively identify Smith as the woman who had stopped by his home while he was talking with Beck.

An employee of the Orange County Sheriff's Department Crime Laboratory analyzed Kelley's clothing, a pillowcase, a towel, and some cords found at the crime scene. The employee obtained DNA matches for Kelley and Derrick on the towel, which

8

had been wrapped around Kelley's head.[13] No DNA from either Smith or Mitchell was found on the towel.

A latent fingerprint examiner for the San Bernardino County Sheriff's Department Crime Laboratory testified that latent fingerprints were obtained from various locations inside the Hassett residence. None of the prints was a positive match to Smith. Some were inconclusive as to Mitchell.

The parties stipulated that numerous shoe impressions were present in the soil in the side yard to the residence and on the carpet in the living room. Three shoe impressions were compared with a pair of shoes seized from Johns's house in Rialto. Two of the impressions, from the dirt, did not match the comparison shoes. The carpet indentation had "the same outline as the two shoes seized and [could not] be excluded as a match." However, "there was not enough information to make a positive or negative match."

4.      *Teresa Johns's 2013 conversations with police and her trial testimony*

As of early 2013, Kelley's death remained "unsolved." In January 2013, a television news program broadcast a report about Kelley's death. Mitchell's mother, Theresa Johns, watched the program. As part of the news story, the police invited members of the community to come forward with any information they might have about

---

13      The match for Derrick was unconfirmed. It was based on data obtained from CODIS, a database that allows users to match an unknown profile with the profile of individuals in the system.

the crime. The police had not released to the general public the fact that Kelley had been found with a pillowcase over her head.

After viewing the news story, Johns contacted police with some information that she believed was relevant to the Kelley murder. Johns knew that Kelley had had a pillowcase placed over her head. According to what Johns told the detective, until she saw the news story, Johns had been under the impression that the victim's grandson had been arrested for her murder. Johns was interviewed twice by police investigators, the first time on January 10, 2013, and the second time on January 30, 2013. During both interviews, Johns made statements implicating Smith and Mitchell in the burglary of the Hassett home.[14]

During the January 10, 2013 interview, Johns described having overheard a conversation between Kesha Williams, a woman who had been living with Johns, and Smith. According to Johns, Smith told Williams that she and Mitchell had burglarized a home and that they had had to subdue an elderly woman by tying her up. Further, she and Mitchell had put a pillowcase on the woman's head, and Mitchell had hit the woman to get her to stop screaming.

During the January 30, 2013 interview, Johns said that prior to police searching her home in 2005, she had heard Mitchell talking with Michael Spinks, Johns's common law husband, in the garage of Johns's home. According to Johns, Mitchell was telling

---

14    Because one of Mitchell's arguments focuses on the propriety of the trial court's admission of some of these hearsay statements against him, we provide further details of the relevant statements in our discussion section.

Spinks "how he hit the lady and she didn't cry no more." He indicated that "Kiesha couldn't keep her quiet." According to Johns, after she heard Smith talking to Williams, she realized that Mitchell had been talking about the same incident that Smith talked to Williams about.

At trial, Johns recanted the statements that she had made during her interviews with law enforcement officers. She explained that at the time she made the statements, she was angry with Mitchell, and she knew what the investigator wanted to hear. Johns said that she had known certain details about the crime because she had had access to police reports, which Mitchell had obtained when he was arrested for possessing stolen property from the Hassett home in 2005. Mitchell had left the police reports with Johns. Johns also said that she had researched the case on the internet.[15]

5. *Additional trial testimony*

Williams testified at trial. In September 2005, she was living with Johns in Rialto, California. Williams was present when police came and searched the house, but she left immediately after that to go to Texas, where she stayed with her mother for a few weeks.

Williams acknowledged that after returning to Rialto, she got into a heated, and physical, confrontation with Johns, which resulted in Williams being arrested. Williams

---

[15] A defense investigator for Smith testified regarding an interview she had with Johns. Johns told the investigator that she had contacted police because she was angry with Mitchell, and she was a vindictive person. Johns also told the investigator that she knew certain details about Kelley's death, including how her body had been found, because she had seen police reports that Mitchell had left or given to her in 2005. Johns also mentioned that she had understood that there was a $10,000 reward related to the case.

was in local custody for several days, and was housed in the same area where Smith was incarcerated after being found with items stolen from the Hassett home. While Williams and Smith were in jail together, Williams overheard Smith tell others that she and her boyfriend had been robbing houses, and that their last robbery "went bad."

Williams testified that she had been threatened in an attempt to discourage her from testifying against Mitchell and Smith. Although she did not feel that Smith had threatened her, Williams said that Smith had relayed threats from Johns. Williams understood Johns to be "erratic" and "[d]estructive," and thought she would do "crazy things sometimes" and could be a "spiteful person."

Williams specifically denied that Smith had told her details about the burglary of the Hassett home while at Johns's residence, as Johns had told police. According to Williams, if Johns asserted that she overheard such a conversation between Williams and Smith, that assertion would be false because Williams and Smith "never had a discussion" regarding a burglary that ended in a death. Williams testified that if she had learned such information, she would not have remained living in Johns's house.

Amay Lott testified that she and Smith were housed in the same area at the West Valley Detention Center in approximately the late fall of 2005. According to Lott, she overheard Smith telling Williams about her case and about the fact that she had been involved in a burglary during which someone had accidentally died. Lott also testified that she had engaged in conversations with Smith, and that during some of these conversations, Smith told Lott about a burglary in which an elderly woman had been in the home. According to Lott, Smith told her that the elderly woman was not supposed to

12

have been at home, and Smith had told "them" to "just leave her alone," and said, "[L]et's go, let's go." But "[t]hey put a pillowcase over her head, and the boys proceeded to beat her." Lott testified that Smith said that "she was trying to get them to stop."[16]

According to Lott, Smith said that they took coins, a "water bottle with coins," a safe, and jewelry, from the residence.

Lott later said that "the grandson approached [Smith] because he wanted crack, and the boyfriend had sold crack." According to Lott, "since he wanted the drugs, that he knew a place where they could go and get some stuff and it was real easy. And then he gave them the combination to the safe."

Lott admitted that she had been convicted of numerous crimes, including making a false financial statement, grand theft, perjury, possession of forged checks, commercial burglary, and receiving stolen property. Lott testified that she had not received any favorable treatment or other benefit as a result of coming forward with her statements against Smith.

6.      *Defense evidence*

Smith did not testify at trial, but Mitchell did. Mitchell said that in 2005, he was selling drugs and living with his mother in Rialto. Smith was his girlfriend, and was living with him at his mother's house "off and on." Other people also lived in the house at the time.

---

16      At another point, Lott altered her testimony and said that Smith said that she was the one "who said they had to put a pillowcase over [the elderly woman's] head because she was fighting" and that Smith said that she, herself, had put the pillowcase over the woman's head.

13

Mitchell did not discuss criminal activity with his mother. However, after he was released from jail in 2005, she told him to stop whatever he was doing.

Mitchell explained that he met Beck through Smith. Mitchell sold Beck drugs in exchange for property (as opposed to money) on one occasion. Mitchell met Beck at his mother's house. Beck brought a "big camping tent bag" that was "full of anything you can think of" to trade for drugs. The bag had coins in it, including foreign currency coins. Mitchell knew that the items were stolen property because he had "been selling drugs for a long time" and had learned that exchanging stolen items was "what most people do that wants drugs from a person like [him]." In exchange for the items, Mitchell provided Beck with approximately $350 worth of drugs.

Mitchell testified that although he was aware that the items Beck had given him were stolen, he was unaware that the items had been taken from the scene of a homicide. If he had known this, he would not have taken the items, or he would have tried to sell them to someone else. Mitchell admitted that he attempted to pawn some of the items that Beck had traded with him.

According to Mitchell, Smith was not involved in his drug transaction with Beck. Mitchell was the one who handled most of the items that Beck had given him, although he might have given Smith a bag "to go put . . . somewhere." For the most part, he was the one who had placed the items in different locations in his mother's house and in Smith's car.

Mitchell testified that sometime between 2005 and 2013, his mother had wanted custody of his children, and he had not been willing to agree to let her have the children.

14

His relationship with his mother during that time period was "[l]ike cats and dogs. Sometimes we're cool, and sometimes we're like absolutely not at all." After Mitchell was arrested for Kelley's murder, Johns told him that she had gotten the story she told police "from [Mitchell's] old discovery."

B.    *Procedural background*

The San Bernardino County District Attorney filed an amended information charging Smith, Mitchell and Beck with one count of first degree murder (Pen. Code,[17] § 187, subd. (a); count 1). The amended information also alleged two special circumstances: (1) that the murder was committed in the course of a robbery, within the meaning of section 190.2, subdivision (a)(17)(A), and (2) that the murder was committed in the course of a second degree burglary, within the meaning of section 190.2, subdivision (a)(17)(G).

Prior to trial, Beck withdrew her plea of not guilty and entered guilty pleas to multiple offenses, including voluntary manslaughter and elder abuse, pursuant to a negotiated plea agreement in which Beck would receive a sentence of 17 years in state prison.

Trial began on February 6, 2014. Separate juries were empaneled for Smith and Mitchell. Both juries found the defendants guilty of first degree murder and found true both of the special circumstance allegations.

---

17    Further statutory references are to the Penal Code unless otherwise indicated.

The trial court sentenced both Smith and Mitchell to sentences of life in prison without the possibility of parole.

Both defendants filed timely notices of appeal.

III.

DISCUSSION

A.      *Smith's appeal*

Smith raises two contentions on appeal. She first argues that the trial court prejudicially erred in instructing her jury that *any* testimony from an accomplice requires corroborating evidence before the jury may accept it as true. As Smith correctly notes, the actual rule is that a jury may not *convict* a defendant of an offense based on accomplice testimony without corroborating evidence. There is no corroboration requirement with respect to exculpatory accomplice testimony. According to Smith, because Mitchell provided testimony that tended to exculpate her, the court's instruction erroneously told the jury that there had to be evidence to corroborate his *exculpatory* testimony before the jury could accept it as true.

Smith's second contention is that the trial court prejudicially erred in discharging Juror No. 8 during the jury's deliberations. She asserts that no valid grounds for discharging this juror are apparent from the record, and further contends that the court's removal of this juror—the only juror who was leaning toward acquittal—violated her right to an impartial jury and to a unanimous verdict under the Sixth and Fourteenth Amendments.

16

1.      *The trial court's instruction on accomplice testimony prejudiced Smith*

Smith argues that the trial court erred in providing the jury with an instruction based on CALCRIM No. 301 that informed the jury that *any* accomplice testimony must be supported by corroborating evidence.  We agree that the court's instruction was erroneous, and conclude that the error was prejudicial.[18]

a.      *The court provided an erroneous instruction regarding accomplice testimony*

Penal Code section 1111 places a limitation on the use of "accomplice" testimony to convict a defendant:  "*A conviction can not* [*sic*] *be had* upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.  [¶]  An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  (Italics added.)

---

[18]      The People maintain that Smith has forfeited this argument by failing to request a correction of the instruction that she challenges on appeal.  The People note that a court is "not obliged to instruct on theories that lack substantial evidentiary support," and suggest that the trial court was not obliged to instruct the jury correctly with respect to accomplice testimony, because, the People argue, there was not substantial evidence of accomplice testimony that exonerated Smith.  The People are incorrect with respect to the state of the evidence.  Mitchell clearly provided testimony that tended to exonerate Smith (as we further address in part III.A.1.b.).  The People's legal analysis is also incorrect.  Once the court determined that it would instruct the jury with respect to accomplice testimony, it was obligated to provide instructions that correctly stated the law.  (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1015 [court has a duty to give legally correct instructions].)

The trial court instructed Smith's jury with an instruction (Instruction No. 12), regarding the testimony of a single witness, which also commented on how the jury was to treat accomplice testimony:

> "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence. However, the testimony of Sherry Beck, Amay Lott, and portions of Kesha Williams require supporting evidence. *The testimony of any other person you determine to be an accomplice also requires supporting evidence.*" (Italics added.)[19]

The trial court also instructed the jury with an instruction based on CALCRIM No. 334, which informs the jury regarding how to decide whether a witness is an accomplice and, if the jury determines that the witness is an accomplice, instructs the jury that it may not use an accomplice's testimony to convict a defendant without some corroborating

_____

[19] The current standard instruction suffers from the same erroneous statement as the instruction given by the trial court in this case:

> "[Except for the testimony of _____ <insert witness's name>, which requires supporting evidence [if you decide (he/she) is an accomplice],] (the/The) testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." (CALCRIM No. 301, boldface omitted.)

The bench notes to this instruction provide:

> "The following constitutional provisions and statutes require evidence that corroborates a witness's testimony: Cal. Const., art. I, § 18 [treason]; Pen. Code, §§ 1111 [accomplice testimony]; 1111.5 [in-custody informant]; 653f [solicitation of felony]; 118 [perjury]; 1108 [abortion and seduction of minor]; 532 [obtaining property by false pretenses].

> "Give the bracketed phrase 'if you decide (he/she) is an accomplice' and CALCRIM No. 334 if the jury must determine whether a witness is an accomplice."

18

evidence. The court instructed Smith's jury as follows, in relevant part, based on

CALCRIM No. 334 (Instruction No. 20):

"Before you may consider the statement or testimony of Kiesha Smith, Michael Mitchell, Kesha Williams, Theresa Johns, Michael Spinks, Derrick Hassett or Christopher Mahan as evidence against the defendants Kiesha Smith or Michael Mitchell, you must decide whether Kiesha Smith, Michael Mitchell, Kesha Williams, Theresa Johns, Michael Spinks, Derrick Hassett or Christopher Mahan were an accomplices [*sic*] to those crimes.[20] A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if:

"1. He or she personally committed the crime;

"OR

"2. He or she knew of the criminal purpose of the person who committed the crime;

"AND

"3. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime; or participate in a criminal conspiracy to commit the crime.

"[¶] . . . [¶]

"If you decide that a declarant or witness was an accomplice, then you may not convict the defendant of felony murder based on his or her statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if:

"1. The accomplice's statement or testimony is supported by other evidence that you believe;

"2. That supporting evidence is independent of the accomplice's statement or testimony;

---

20    The instruction did not inform the jury of the "crimes" to which the phrase "those crimes" referred.

19

"AND

"3. That supporting evidence tends to connect the defendant to the commission of the crime.

"[¶] . . . [¶]

"Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

Since Mitchell was being prosecuted for the very same crime with which Smith was charged, he necessarily met the definition of an accomplice. At trial, Mitchell provided exculpatory testimony, not only as to himself, but also as to Smith—i.e., he provided testimony that was not properly subject to the rule requiring corroboration. Penal Code section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated . . . ." Exculpatory testimony, by definition, cannot be said to support a conviction, and thus need *not* be corroborated.

Instruction No. 20 properly instructed the jury that it could "*not convict* the defendant of felony murder based on [an accomplice's] statement or testimony alone," but that such statements must be supported by independent corroborating evidence tending to connect the defendant to the crime. (Italics added.) However, the jury was given this instruction only after having been instructed with Instruction No. 12 that "[t]he testimony of any other person you determine to be an accomplice also requires supporting evidence," without further explanation that this instruction applies only when such testimony is being used to determine a fact used to *convict* a defendant.

20

Instruction No. 12 was erroneous because it instructed the jury that if it determined that Mitchell was "subject to prosecution for the identical crime charged against [Smith]" then *all of Mitchell's testimony*, including the exculpatory testimony pertaining to Smith, required corroborating evidence before the jury could accept it as true.  Instruction No. 12 improperly informed the jury that there must be corroborating evidence to support an accomplice's testimony that is either neutral or exonerating.

b.     *The instructional error was prejudicial*

The People maintain that the trial court's instructions, including Instruction No. 12 and Instruction No. 20, were proper and correct, and suggest that this is so because Mitchell's testimony was not exculpatory as to Smith.  Apparently convinced of the correctness of this position, the People provide no analysis with respect to the prejudice that may have resulted if the trial court's instructions were, in fact, erroneous.  We therefore undertake a prejudice analysis without the benefit of the People's position.

Smith does not contend that the trial court's instructional error is subject to the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, but rather, that harmlessness review under the standard announced in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), is appropriate.  We need not decide which standard of review applies because we conclude that even under the *Watson* standard, reversal is required.

"Under the *Watson* standard, prejudicial error is shown where ' " 'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  [Citation.]  "We have made clear

21

that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." ' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

There is more than an abstract possibility that the instructional error affected the verdict in this case. The record demonstrates that Instruction No. 12 became a point of disagreement between a lone hold-out juror and the other 11 jurors, and that the hold-out juror was ultimately dismissed, in part because the other jurors believed that this juror was unwilling to follow the court's erroneous instruction regarding the need for corroboration of *any* accomplice testimony, regardless of whether that testimony was inculpatory or exculpatory.

First, contrary to the People's contention on appeal, it is clear that Mitchell's testimony *did* exculpate Smith. Mitchell testified that he obtained the items that were taken from the Hassett home when Beck exchanged those items with him for drugs. He further testified that Smith was not involved in the drug transaction with Beck, and specifically stated that Smith had not even really handled any of the items he had obtained from Beck, although he may have asked her to put an item or two somewhere for him. Although Mitchell acknowledged that he had been introduced to Beck through Smith, nothing about Mitchell's testimony expressly or implicitly implicated Smith in the

burglary of the Hassett home, or in Kelley's death.  Mitchell's testimony was exculpatory as to himself and also had the effect of exculpating Smith.[21]

Smith's jury clearly considered whether it could accept Mitchell's testimony as true, without corroboration from an additional source.  The jury began deliberating on April 2, 2014.  During the first few days of deliberations, the jury requested read-backs of testimony, including Mitchell's.  On April 8, 2014, in the afternoon, the foreperson sent a note to the judge indicating that she had concerns about one juror who she said had "repeatedly refused to deliberate further, to verbalize his doubt, and to follow some jury instructions."  The foreperson's note indicated that the jurors were in agreement except for this one juror.

After receiving the note, the judge spoke with the foreperson on the record.  The foreperson explained:

> "We've had — we've had a very intense several days.  And we certainly have not had for days consensus except for one person.  So we've — we've done, I think a lot of review of the evidence and really looking at the doubts that, you know, we might have about the situation. . . .  [¶]  So yesterday we began the process of determining kind of where we were.  Okay.  So we took an anonymous sample vote.  And we had several people who were still undecided, and so we spent the rest of the morning deliberating and again talking over the evidence and reviewing the jury instructions.  For example, regarding Michael Mitchell's testimony and if — that he, being considered an accomplice, there would need corroborating

---

21    The People suggest that Mitchell could not be viewed as an accomplice if his testimony exculpating himself was to be believed.  However, the Penal Code defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)  Mitchell was therefore, by definition, an accomplice since he was being prosecuted for the identical offense with which Smith was charged.

23

testimony.  In order to use his testimony as, you know, as truth.  So that was helpful in going back to the jury instructions to several people who were like, well, that's right actually.  And it pulled things together for several of the other jurors.

"[¶] . . . [¶]

"You know, one thing [Juror No. 8] talks about a lot is Michael's testimony, which we've — I mean, hours we spent talking about Michael's testimony and how, because he is an accomplice, we would need corroborating evidence.  And that got worked out for most people.  And he said, 'Well, I'm not going to follow that.  I don't think that is true and I'm not going to follow that.'  I clarified with him, 'Let me reread this jury instruction.  Are you saying that you are not going to follow that jury instruction?'  And he said, 'Yep, I can't — can't do that.' "

The trial court then interviewed Juror No. 8, and inquired of him as to how the deliberations were going.  Juror No. 8 told the court, "Well, you know, to finalize and make it easier, I, in good conscience — and it was argued that I wasn't listening to the law.  And I said, 'No, I feel like I am.'  So in good conscience the verdict that I picked, I can't change it.  And we've rehashed it over and over.  With all due respect to the court, I just cannot change it.  I've done this, went over and over and kind of got heated.  But I just said, 'No, I really do in good conscience believe what I believe.  And so I don't know what else to say.' "

After asking Juror No. 8 a few more questions, the court said, "There was a concern that at least as to one jury instruction that you indicated that you couldn't follow that particular instruction."[22]  Juror No. 8 replied that he had never said such a thing.

---

[22]     There were five jury instructions that referenced accomplice testimony (Instruction Nos. 12, 20, 21, 41 & 42).  Instruction Nos. 21 and 42 specifically referred to

24

The court then asked whether Juror No. 8 knew which instruction the court was referring to, and Juror No. 8 responded, "It was just mentioned. And I said that is not what I'm doing. I believe I'm following the law." The court then asked, "And in particular the instruction that we were apprised or I was just apprised of was the instruction regarding accomplice testimony requiring corroboration. Has that been discussed?" Juror No. 8 responded that it had been discussed several times, and he believed that he had expressed his opinion.

The following day, the court inquired of the other members of the jury. Some, although not all, of the other jurors expressed a concern that at least one juror had indicated an unwillingness to "follow the law or the jury instructions."

For example, when asked whether Juror No. 8 had made any comment pertaining to the "instruction regarding accomplice testimony requiring corroboration," Juror No. 5 stated:

> "He — he did believe one testimony of an accomplice. However, when we were discussing and when we were trying to evaluate that testimony, we, as a jury, didn't find anything to corroborate that evidence. However, Juror No. 8 still believed that that evidence was true regardless, that there was no corroborating evidence to prove that."

Sherry Beck being an accomplice if the jury made certain other findings, and then repeated the directions on the use of accomplice testimony provided in Instruction No. 20. However, the court, foreperson, and other jurors never specified *which* instruction regarding accomplice testimony was being referenced during all of these discussions, and the court consistently spoke of a single jury instruction that Juror No. 8 was being accused of failing to follow. As we have already pointed out, however, the instruction referring to accomplice testimony corroboration in Instruction No. 12 was in conflict with the instruction referring to accomplice testimony corroboration in Instruction No. 20 (and repeated in Instruction Nos. 21, 41 & 42), with respect to the requirement of corroboration for exculpatory accomplice testimony.

25

Upon inquiry from the court, other jurors made similar statements about the jury's discussions regarding the instruction on accomplice testimony.[23]

The trial court eventually had a second discussion with Juror No. 8. During that discussion, the court again raised the issue of the "jury instruction [that] had to do with accomplice testimony requiring corroboration." Juror No. 8 again told the court that he believed that he was following the court's instruction, and that he felt as if he had "been cut off" by other jurors when he tried to express his views.

The trial court ultimately dismissed Juror No. 8, and provided two reasons for the dismissal: (1) that the juror failed to disclose a 1999 misdemeanor conviction in Riverside County, and (2) "that Juror No. 8, in his own opinion, is unable to continue as a juror in this case." The court also mentioned a possible third reason, i.e., "what the court perceives as a potential failure to properly deliberate." After the court replaced Juror No. 8 with an alternate juror, the jury unanimously convicted Smith of the charged offense, and found the special circumstances true.

---

[23]  The trial court and the jurors appear to have repeatedly assumed either that there was a single instruction regarding the need for corroboration of accomplice testimony, or that the instructions all said the same thing, when, in fact, the two most significant instructions provided by the court regarding accomplice testimony were not the same, and indeed, were in conflict with respect to whether exculpatory testimony of an accomplice had to be corroborated. In fact, the way that the court discussed the issue, by repeatedly referring to the instruction as a single one providing that accomplice testimony "requires" corroboration, suggests that the court was also under the misimpression that *all* accomplice testimony, and not only inculpatory accomplice testimony, required corroboration. As we have already explained, the law does not require that exculpatory accomplice testimony be corroborated.

26

The record demonstrates that the members of the jury, other than Juror No. 8, were applying the corroboration requirement to Mitchell's exculpatory testimony. This is made clear by the foreperson's comments, and is further supported by the comments made by a number of other jurors. Because Mitchell's testimony was clearly exculpatory as to Smith, no corroboration of his testimony was required if a juror wanted to accept his testimony as true, as Juror No. 8 apparently did. Yet Juror No. 8 was repeatedly told by other members of the jury that the instructions provided that the jurors could not accept that testimony as true without corroboration from another source. It is thus clear that the jury not only understood the trial court's instruction in Instruction No. 12 as requiring corroboration for any accomplice testimony, whether inculpatory or exculpatory, but that the jury believed that Mitchell fit the definition of an accomplice (a correct determination), and that his exculpatory testimony could not be believed because it was uncorroborated.

Juror No. 8 was attempting to apply the law correctly—i.e., to accept Mitchell's exculpatory testimony as true without requiring corroboration, and for this reason, was held out to the court by the other jurors as being unwilling to follow the court's instruction. It is clear from the record that the rift that emerged in the jury with respect to court's instructions pertaining to the requirement of corroboration of accomplice testimony is what ultimately led to Juror No. 8's dismissal from the jury, even if the reasons given for Juror No. 8's dismissal were not specifically that Juror No. 8 refused to apply the instructions provided by the court. Given this record, we can reach no conclusion other than that the trial court's erroneous instruction regarding the requirement

27

that an accomplice's testimony be corroborated, irrespective of the nature of that testimony as inculpatory or exculpatory, affected Smith's verdict. In our view, it is at least reasonably probable that Smith would have obtained a more favorable result if the jury had not been erroneously instructed with respect to accomplice testimony. (See *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1535 [a hung jury is considered more favorable than a guilty verdict].)

2.      *Smith's other contention on appeal*

Because we reverse Smith's first degree murder conviction on the ground that the trial court's erroneous instruction concerning accomplice testimony prejudiced Smith, we need not address her additional contention that the trial court erred in discharging Juror No. 8 during deliberations.

B.      *Mitchell's appeal*

1.      *Admission of statements that Smith made to acquaintances*

Mitchell raises a number of legal claims challenging the trial court's admission of evidence regarding statements that Smith purportedly made to acquaintances that inculpated both Smith and Mitchell in the burglary of the Hassett home and Kelley's murder. Although we disagree with Mitchell's contention that the admission of these statements violated his Sixth Amendment right to confront witnesses against him, we agree that the statements should not have been admitted against him under California's rules of evidence. We further conclude that the admission of these statements was prejudicial to Mitchell under any standard of prejudice review, and that Mitchell's conviction must therefore be reversed.

28

### a. *Additional background*

The prosecutor sought to admit hearsay statements about the crime purportedly made by Smith to two individuals—Kesha Williams, Mitchell's mother's roommate, as allegedly overheard by Mitchell's mother, and Amay Lott, an individual who was detained in county jail with Smith.

In response to the parties' in limine motions, the trial court initially indicated that it intended to deny the defense motions to exclude the statements by Johns and Lott. After being apprised of the fact that the statements would not be statements by a party with respect to Mitchell, as opposed to Smith, the trial court reserved ruling on the matter "pending further briefing by counsel." Later, during trial, the trial court ruled that portions of Johns's statements about Smith's statements would not be admitted against Mitchell:

> "Well, the court's ruling, so there is no misunderstanding, is that after analysis in *Cervantes* and *Greenberger*, as previously cited by this court, the totality of the circumstances are such that the court is going to exclude testimony by Miss Johns regarding anything that she overheard Miss Smith say that implicates Mr. Mitchell. It only applies to Mr. Mitchell. The court is not excluding any testimony from Miss Johns about what she overheard Mr. Mitchell and Mr. Spinks saying. That's admissible as a party admission. And anything she heard Miss Smith saying is admissible against Miss Smith as a party admission. It's just the issue of what Miss Smith told or was overheard saying that implicates Mr. Mitchell that the court is not going to allow Mr. Mitchell's jury to hear."

However, the following day, the trial court again reversed course. The court concluded that the statements at issue were not testimonial, and therefore, were not inadmissible under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). The court

29

also found that given that the alleged statements had been made in a residential setting and were made "amongst family members and close friends," the statements could be considered trustworthy. Although the prosecutor argued that the statements were admissible as to Mitchell as declarations against Smith's penal interest, the court provided no analysis as to whether the entirety of Smith's statements were *specifically disserving* as to Smith—i.e., whether the statements were in fact against Smith's interests—such that they could be properly admitted against Mitchell under the hearsay exception for declarations against the declarant's interest as codified in Evidence Code section 1230.

Ultimately, the trial court permitted Mitchell's jury to hear testimony regarding Johns's statements to police and to view the full transcripts of Johns's interviews with police. The trial court also permitted Lott to testify regarding statements Smith purportedly made to Lott.

The evidence presented to Mitchell's jury included the following information: In January 2013, Mitchell's mother, Theresa Johns, was watching a television program that discussed the unsolved Kelley murder. During the program, the police invited members of the community to come forward with any information that they might have about the crime.

After viewing the program, Johns contacted police with information that she believed was relevant to the Kelley murder. Johns provided details about the case that had not been made public. Johns participated in two interviews with investigators, the first on January 10, 2013, and the second on January 30, 2013. During both interviews,

30

Johns made statements implicating both Smith and Mitchell in the robbery of the Hassett home.

During the January 10, 2013 interview, Johns told a detective that Kesha Williams had been living with Johns. One day, while Smith was braiding either Williams's hair or Johns's hair, Johns heard Smith "sharing with Kesha Williams um that she held the lady. A lady was screaming' and– and that my son was screaming– was mad at her 'cause she couldn't hold the lady down and–." Johns said that when she walked in, Smith was talking about "how she uh– she was holding the lady and– and the lady kept screaming and– and moving, so they tied her up. I don't know where they tied her up at, but they tied her up and she kept on– Kiesha couldn't– couldn't handle her, so I guess um he told– my son told her to either– to put something over her– a sheet or a pillow case or something– to put something over her to keep her quiet and then she said, I couldn't believe he just started hitting her. And that's what I heard her say."

When the detective asked, "[H]ow was he hitting her?" Johns responded, "He was just– I guess with his fist – she said he was just hitting her. And I think at one point, he hit her so hard it knocked [her] out or something. And– and I'm like, well what are you, you know, what– what a– what– what are you talking about? And then she was like, oh you talk too much and he'll kill us. But not saying he'll kill us like for real, but just, you know, he would probably, you know, fight her, but she was– 'cause they won't never tell me nothing because like– they say I talk too much."

Johns and the detective spoke about the timing of various events in Johns's story, and who was present when Johns overheard Smith's statements. Johns then said, "I'm not

31

for sure, but she was doing one of our hair . . . and that's when, you know she was just talking about what happened *how he hit her* and then she fell to the–." (Italics added.)

In a later interview, Johns said that she had heard Smith tell Williams that she and Mitchell "took some cord," possibly from a telephone, to tie the woman up. She then said that *Mitchell* hit the woman, and she "didn't um cry no more."

When asked about the statements at trial, Johns recanted much of what she had said during her interviews with investigators. She maintained that what she had said to investigators was said out of anger toward her son and in an effort to retaliate against him. Johns said that she had lied in order to hurt her son. Johns also testified at trial that she had obtained the information that she provided to investigators during her interviews from police reports, which Mitchell had left with her.[24] In addition, Johns testified that she had researched the case on the Internet and had read newspaper reports about the crime.

Williams testified that she lived with Johns in September 2005. However, Williams denied that Smith had told her details about the burglary of the Hassett home, and specifically denied that Smith had told her anything about a robbery while one of them was braiding the other's hair. Williams acknowledged that she and Smith had been in jail at the same time. While Williams and Smith were in jail together, Williams did

---

[24]    Mitchell testified that after he was arrested for possessing stolen property in 2005, he was in possession of police reports related to the burglary of the Hassett home, which included details about the crime. Johns had access to this information.

32

overhear Smith tell others that she and her boyfriend had been robbing houses, and that their last robbery "went bad."

Amay Lott, who had been housed in the county jail in 2005 at the same time that Smith and Williams were there, testified that while in jail, Smith had spoken about a burglary and murder in which she and Mitchell had been involved.[25] According to Lott, the original "story that [Smith] had in there [i.e., in the county jail]" was that "[s]he was in there for a probation violation." However, Lott testified that she overheard Smith tell Williams about a burglary at a house where an "old lady" was home. According to Lott, Smith said that her boyfriend Michael was there, as well as another woman and another man. Although Lott initially said that she overheard Smith talking to Williams about the crime,[26] Lott later indicated that Smith had told Lott details about what "happened inside the house." According to Lott, Smith said that "[t]hey went in there to rob the house, and apparently she – the lady was there. It scared them. That they ended up putting – she was telling them just leave her alone, let's go, let's go. They put a pillowcase over her head, and the boys proceeded to beat her. And she was trying to get them to stop, but they–." Lott testified that Smith told her that "[t]he boyfriend" put the pillowcase over the woman's head, and that "[t]he cousin" was the one who "tied up the elderly lady."

---

[25]  Lott admitted that she had been convicted of multiple crimes between 1993 and 2007, including making a false financial statement, grand theft, perjury, possession of forged checks, passing false checks, commercial burglary, receiving stolen property, forgery, making false statements, possessing a false driver's license, false impersonation, and driving or possessing a stolen car.

[26]  Lott also contended that Smith implicated Williams as the other woman involved in the crime.

Lott indicated that the group had taken items from the house, including rare coins, bottles of change, and jewelry.

    b.    *The admission of the statements did not violate the confrontation clause because the statements are not testimonial*

Mitchell's first challenge to the admission of evidence regarding Smith's statements to Williams, as overheard by Johns, and Smith's statements to Lott is that the admission of these statements violated his right to confront witnesses because he was denied an opportunity to cross-examine Smith. This contention is without merit because the challenged statements are not testimonial, and Mitchell's confrontation rights were therefore not implicated by their admission.

Prior to the United States Supreme Court's decision in *Crawford*, the Court had interpreted the Sixth Amendment to permit the admission of out-of-court statements by an unavailable witness, as long as the statements bore "adequate 'indicia of reliability' " (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 (*Roberts*)). Such indicia existed if "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." (*Ibid.*) In *Crawford*, the Court "adopted a different approach" to the Sixth Amendment's concerns. (*Ohio v. Clark* (2015) ___ U.S. ___ [135 S.Ct. 2173, 2179] (*Clark*).) The *Crawford* opinion "explained that 'witnesses,' under the Confrontation Clause, are those 'who bear testimony,' and . . . defined 'testimony' as 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " (*Clark*, *supra*, at p. 2179, quoting *Crawford*, *supra*, at p. 51.)

34

*Crawford* held that the Sixth Amendment "prohibits the introduction of *testimonial* statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (*Clark*, *supra*, 135 S.Ct. at p. 2179, quoting *Crawford*, *supra*, 541 U.S. at p. 54, italics added.)

United States Supreme Court decisions after *Crawford* have attempted to explain what types of statements are "testimonial" for purposes of the Sixth Amendment, since *Crawford* "did not offer an exhaustive definition of 'testimonial' statements." (*Clark*, *supra*, 135 S.Ct. at p. 2179.) For example, in *Davis v. Washington* (*Davis*) and *Hammon v. Indiana* (*Hammon*) (2006) 547 U.S. 813, which were decided together, the Court considered statements given to law enforcement officers. The victim in *Davis* made statements to a 911 emergency operator during and immediately after an attack. (*Id.* at pp. 817-819.) In *Hammon*, after the victim was isolated from her abusive husband, she made statements to police that were memorialized in something called a " 'battery affidavit.' " (*Id.* at pp. 819-820.) The United States Supreme Court held that the statements at issue in *Hammon* were testimonial, but that the statements at issue in *Davis* were not. The court offered the following test for determining whether a statement is testimonial: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822.) However,

35

because both *Hammon* and *Davis* involved statements made to law enforcement officers, the Court reserved the question whether similar statements to individuals *other* than law enforcement officers would raise issues under the Confrontation Clause. (*Id.* at p. 823, fn. 2.)

In 2011, the United States Supreme Court further elucidated the "primary purpose" test, explaining that a court must consider "all of the relevant circumstances." (*Michigan v. Bryant* (2011) 562 U.S. 344, 369.) Specifically, "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." (*Id.* at p. 358.) "[T]he existence *vel non* of an ongoing emergency is *not* the touchstone of the testimonial inquiry." (*Id.* at p. 374, first italics in original, second italics added.) Instead, "whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." (*Id.* at p. 366.) Another factor a court is to consider is "the informality of the situation and the interrogation." (*Id.* at p. 377.) "A 'formal station-house interrogation,' like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." (*Clark*, *supra*, 135 S.Ct. at p. 2180.) Another factor a court is to consider is *to whom* the statements were made. Although the United States Supreme Court has declined to adopt a categorical rule excluding statements made to individuals who are not law enforcement officers from the Sixth Amendment's reach, the Court has noted that "such statements are

much less likely to be testimonial than statements to law enforcement officers." (*Id.* at p. 2181.)

Ultimately, the question that a court must answer in determining whether a statement falls within the ambit of the Confrontation Clause is whether, in light of all the circumstances and when viewed objectively, "the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " (*Clark*, *supra*, 135 S.Ct. at p. 2180.)[27]

In considering the circumstances surrounding the statements at issue, we cannot conclude that the statements are "testimonial" under the "primary purpose" test. The challenged statements are alleged to have been made to acquaintances, not to law enforcement officers. They were clearly not made during an interrogation, and there is not a single circumstance that would lead one to conclude that the conversations occurred to establish past events for the purpose of a future criminal prosecution. Any conversations that Smith had with either Williams (as overheard by Johns) or Lott were not had for the primary purpose of creating an out-of-court substitute for testimony. We therefore conclude that Mitchell's claim that his right to confront witnesses was violated by the admission of these statements is without merit. However, that does not end our

---

[27]     We reject Mitchell's contention, based on *Lilly v. Virginia* (1999) 527 U.S. 116 (*Lilly*), that the Sixth Amendment "appear[s] to come into play even where hearsay evidence is viewed as non-testimonial." *Lilly* relied on *Roberts*, *supra*, 448 U.S. 56 for its holding, but *Roberts* was effectively overruled in *Crawford*, *supra*, 541 U.S. at page 51. Thus, as courts have repeatedly expressed, "[o]nly the admission of testimonial hearsay statements violates the confrontation clause." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812.)

37

inquiry. We must also consider whether the statements were properly admitted under the hearsay exception for statements against the declarant's interest.

      c.    *Although some portions of the challenged statements were against Smith's penal interest, the statements were an attempt to place blame on Mitchell, and as such, were improperly admitted under the hearsay exception for statements against interest*

Mitchell's second challenge to the admission of hearsay evidence of Smith's statements to William and Lott is that the statements do not qualify as statements against interest, and, therefore, were not admissible against him pursuant to this exception to the hearsay rule.

Hearsay evidence is generally inadmissible. (Evid. Code, § 1200.) "The chief reasons for this general rule of inadmissibility are that the statements are not made under oath, the adverse party has no opportunity to cross-examine the declarant, and the jury cannot observe the declarant's demeanor while making the statements." (*People v. Fuentes* (1998) 61 Cal.App.4th 956, 960-961; see also *Williamson v. United States* (1994) 512 U.S. 594, 598-599 (*Williamson*) [discussing similar bases underlying federal hearsay rule].)

The touchstone of the admissibility of hearsay statements that do not violate the Confrontation Clause under an exception to the hearsay rule is the reliability of the statements. Indeed, because the rule excluding hearsay is based on the difficulty presented in assessing the credibility of a statement that is made outside of the jury's presence, "the focus of the rule's several exceptions is . . . on the reliability of the out-of-court declaration." (*People v. Cudjo* (1993) 6 Cal.4th 585, 608 (*Cudjo*).) "Thus, the

38

various hearsay exceptions generally reflect situations in which circumstances affording some assurance of trustworthiness compensate for the absence of the oath, cross-examination, and jury observation." (*Ibid.*)

One exception to the hearsay rule exists with respect to declarations made by a party against that own party's interests: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

With respect to the exception to the hearsay rule for declarations against interest, the proponent of the evidence "must show that the declarant is unavailable, that the declaration was against the declarant's . . . interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*); *People v. Lucas* (1995) 12 Cal.4th 415, 462.) We review a trial court's decision as to whether a statement is admissible as a declaration against penal interests for an abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153-154 (*Lawley*).)

It is clear that only statements that are *specifically disserving* to the hearsay declarant's penal interests are admissible as statements against penal interests. (*Lawley*,

39

*supra*, 27 Cal.4th at p. 153; *Duarte*, *supra*, 24 Cal.4th at p. 612.) Self-serving and collateral statements are not against one's penal interest, and are therefore not admissible. (*Duarte*, at pp. 611-612; *Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 171-173.) Moreover, "[e]ven a hearsay statement that is *facially inculpatory of the declarant* may, when considered in context, *also be exculpatory or have a net exculpatory effect*," and thus, not be admissible as a declaration against interest. (*Duarte*, at p. 612, italics added.) "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." (*Williamson*, *supra*, 512 U.S. at pp. 599-601 [the declaration against interest in rule 804(b)(3) of the Federal Rules of Evidence requires preclusion of statements that are "non-self-inculpatory," even if they are made within broader narrative that is generally self-inculpatory].)

In *People v. Leach* (1975) 15 Cal.3d 419, 426 (*Leach*), several defendants were charged with conspiracy to commit murder. Prior to trial, some of the defendants made statements describing the conspiracy that inculpated themselves and other defendants. (*Id.* at pp. 438-442.) The Supreme Court concluded that the statements had been improperly admitted at trial because the exception for admissions against penal interest was "inapplicable to evidence of any statement or portion of a statement not itself *specifically disserving* to the interests of the declarant." (*Id.* at pp. 441-442, fn. omitted, italics added.)

40

In *Duarte*, *supra*, 24 Cal.4th at pp. 613-614, the Supreme Court explained that the holding in *Leach* ultimately rests on considerations of reliability, in that a facially inculpatory statement, when viewed in context, may actually be exculpatory or self-serving, and thus, untrustworthy. In *Duarte*, for example, the defendant and another man were charged with shooting at a dwelling. (*Id.* at pp. 607-609.) Prior to the defendant's trial, the other man gave police a statement in which he acknowledged his participation in the crime but minimized his role in it. (*Id.* at pp. 611-614.) A redacted version of the statement was admitted at the defendant's trial as an admission against the accomplice's penal interest. (*Id.* at p. 609.) The *Duarte* court noted that " 'the precedents in the hearsay area provide a persuasive reminder that declarations against penal interest may contain self-serving and unreliable information' and, consequently, 'an approach which would find a declarant's statement wholly credible *solely because* it incorporates an admission of criminal culpability is inadequate.' " (*Id.* at p. 611.) "As scholars have observed, ' "a self-serving statement lacks trustworthiness whether it accompanies a disserving statement or not." ' " (*Ibid.*)

After considering other authorities, the *Duarte* court explained: "Under the rule of *Leach*, a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' " (*Duarte*, *supra*, 24 Cal.4th at

41

p. 612, quoting *In re Larry C.* (1982) 134 Cal.App.3d 62, 69.)[28]  Applying these rules, the *Duarte* court concluded that the redacted statement made by the defendant's accomplice, when viewed in context, was self-serving, and thus, had been improperly admitted.  (*Duarte*, at pp. 612-613.)

The Supreme Court has since clarified that the *Leach* rule does not necessarily require the exclusion of statements simply because the statements inculpate both the declarant and other individuals; rather, *Leach* requires the exclusion of statements that minimize a declarant's guilt or attempt to shift blame to others.  (See *People v. Samuels* (2005) 36 Cal.4th 96, 101-106 (*Samuels*).)  In *Samuels*, the defendant asked an accomplice to murder her husband.  Once the accomplice had completed the act, the defendant successfully solicited two other men to murder the original accomplice.  At the defendant's trial, a witness testified that the original accomplice had said, " 'He had done it and Mike [Silva] had helped him.  And that [the defendant] had paid him.' "  (*Id.* at p. 120.)  The *Samuels* court held that this entire statement was properly admitted as a declaration against penal interest, despite the reference to the defendant:  "This admission, volunteered to an acquaintance, was specifically disserving to [the original accomplice's] interests in that it intimated he had participated in a contract killing—a

---

[28]    Although the principle animating the declaration against interest exception to the hearsay rule is a consideration of the trustworthiness of a statement made against one's interests, California does not provide a hearsay exception for any statement determined to be generally reliable or trustworthy:  "California, unlike federal courts and some state jurisdictions, does not have a 'residual hearsay' exception that permits any hearsay statement into evidence as long as it bears sufficient indicia of reliability."  (*In re Cindy L.* (1997) 17 Cal.4th 15, 27-28; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1289 & fn. 24.)

particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to [the] defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of [the original accomplice's] precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id.* at pp. 101-106, 121.)

In this case, as in many of the above-referenced cases, there is no dispute that Smith was unavailable as a witness. Thus, the issue is whether her out-of-court statements were specifically self-disserving and sufficiently trustworthy/reliable to be admissible pursuant to the exception for declarations against interest.

The parties agree that "[t]here is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and *anything else relevant to the inquiry*." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 (*Greenberger*), italics added.)

Statements that inculpate a nondeclarant must be subjected to close scrutiny. "This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is *least reliable in that portion which shifts responsibility*. Controversy necessarily arises when the declarant makes statements which are *self-inculpatory as well as inculpatory of another*. This is why Evidence Code section 1230 only permits an

43

exception to the hearsay rule for statements that are specifically disserving of the declarant's penal interest. [Citation.] . . . Such a determination [as to whether a statement is specifically disserving of the declarant's interest] necessarily depends upon a careful analysis of what was said and the totality of the circumstances." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335, italics added.)

The People assert that Smith's statements to Williams and Lott were properly admitted against Williams because the statements "were entirely disserving to [Smith] as she wholly and equally implicated both herself and Mitchell in the burglary and murder." However, given the very specific requirements of the exception for declarations against interest, we conclude that the trial court erred in ruling that the statements were admissible against Mitchell under this exception. A number of portions of the statements that were admitted were not "specifically disserving" of Smith's interest. In fact, many portions of the statements appear to constitute an attempt by Smith to shift blame to Mitchell and away from herself. Virtually every reference to Mitchell involved a claim that he, and not Smith, engaged in violence against the victim and/or that he bore sole responsibility for placing the victim in a precarious circumstance. As we further explain below, these portions of the statements do not qualify as statements against Smith's penal interest and were therefore improperly admitted in evidence.[29]

_____

[29]   In addition, at least with respect to Johns's statements about what she claimed to have overheard Smith telling Williams about the burglary, there were significant questions about the reliability of these statements. Such questions undermined the prosecution's showing that the declarations that it sought to admit were "sufficiently

44

i. *The evidence of Smith's statements to Williams, as reported by Johns*

We first consider the evidence of the statements that Johns said she overheard Smith make to Williams to determine whether all of these statements, as described by Johns, were specifically disserving to Smith, such that they were properly admissible against *Mitchell*. Again, self-serving and collateral statements do not qualify as statements against one's penal interest, (*Duarte*, *supra*, 24 Cal.4th at pp. 611-612), and "[e]ven a hearsay statement that is *facially inculpatory of the declarant* may, when considered in context, *also be exculpatory or have a net exculpatory effect*," and thus, not be admissible as a declaration against interest. (*Id.* at p. 612, italics added.) Many of the inculpatory portions of the statements that Smith is alleged to have made to Williams involved statements that, while implicating Smith in the burglary, attempt to place all of the blame for any harm done to the victim directly on Mitchell. The statements attributed to Smith by Johns demonstrate an express attempt to minimize Smith's own involvement, while specifically inculpating Mitchell. For example, Smith claimed that Mitchell was the one who had come up with the idea to cover the victim's head with a pillowcase, that it was Mitchell's idea to bind the victim, and that it was Mitchell who beat the victim unconscious. Other portions of Smith's statements were particularly self-serving, as opposed to self-disserving. For example, according to Johns, Smith said that she could not believe what was happening when Mitchell began beating the woman. None of these

reliable to warrant admission despite [their] hearsay character." (*Duarte*, *supra,* 24 Cal.4th at pp. 610-611.)

45

statements was specifically disserving, and therefore, none qualified as a statement against Smith's interest.

The People maintain that Smith's statements were "wholly disserving" of her own interests, and contend that she "implicated herself in the burglary and the murder *without attempting to shift blame or cast herself in a more favorable or sympathetic light*." (Italics added.)  This argument is disingenuous.  By placing responsibility for the violence directed at the victim squarely on Mitchell's shoulders, Smith's statements cannot reasonably be viewed as anything other than an attempt to shift blame to Mitchell and to cast herself in a more favorable or sympathetic light.  Further, although Smith's statements may have, as a legal matter, implicated her not only in the robbery/burglary, but, as a result of the felony murder rule, in Kelley's murder as well, the exception for statements against interest focuses on whether a "reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true."  (Evid. Code, § 1230.)  A "reasonable" person would be unlikely to recognize the full legal import of the felony murder rule, and would likely believe that it was *in* her penal interest to minimize her role and place the blame for an unintended death on an accomplice.

As a result, Smith's statements minimizing her own role and placing blame on Mitchell for any harm to the victim should have been redacted from the entirety of Johns's interview in which she described Smith's purported statements to Williams.

We next consider whether the statements Johns said she overheard Smith make to Williams were trustworthy/reliable.  (See *Duarte*, *supra*, 24 Cal.4th at pp. 610-611 [party seeking to admit evidence pursuant to the declaration against interest exception "must

show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made *and that the declaration was sufficiently reliable to warrant admission despite its hearsay character*" (italics added)].) The record contains a significant amount of evidence that casts doubt on the reliability of Johns's statements concerning Smith's purported statements. Again, courts consider a variety of factors in determining whether a particular statement may be considered trustworthy, including " 'the words [and] the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant' " (*Cudjo*, *supra*, 6 Cal.4th at p. 607) as well as "the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge . . . and anything else relevant to the inquiry." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 334.) According to one court, "the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others" and the "most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Id.* at p. 335.)

This case presents a unique circumstance with respect to the "reliability" of the statements, separate from whether the statements were, in fact, declarations against the declarant's interest. While the statements at issue were ostensibly made in the "most reliable circumstance" (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335) because they were purportedly made by Smith in a noncoercive setting—i.e., to an acquaintance in Johns's home, there are other factors that bear on the reliability of these statements as a result of

47

the fact that the statements were presented through the use of other out-of-court statements made by Johns to a police detective, creating double hearsay and an additional level of reliability concerns.[30]  Although Johns's statements to the detective were admissible pursuant to the prior inconsistent statement exception to the hearsay rule, on the ground that Johns recanted at trial and claimed that she never overhead Smith make the statements at issue, the record demonstrates that Johns's statements about Smith's statements may not have been sufficiently reliable to warrant the admission of Smith's statements (through Johns's statements) pursuant to the hearsay exception identified in Evidence Code section 1230, even if the statements had been sufficiently disserving of Smith's interest.

Mitchell suggests that Johns was an unreliable witness, given the fact that she admitted to being a vindictive mother and said that she had made up the entire story because she was angry with her son and wanted to get revenge.  Certainly, there is evidence that could support Johns's trial version of how she knew certain information about the crime, including the fact that Mitchell had left court papers with her related to the crime, and the fact that she claimed to have done Internet research.  However, what raises concern is not solely Johns's recanting and whether this undermines her statements to police, but more importantly, the fact that Williams, to whom Smith's statements were

---

[30]    The California Supreme Court has acknowledged that "the probative value of hearsay evidence decreases with each level of hearsay."  (*People v. Zapien* (1993) 4 Cal.4th 929, 956.)

48

supposedly directed, specifically denied under oath that the conversation that Johns claimed to have overheard between Williams and Smith ever took place.

Williams testified at trial that she lived with Johns for two or three months. Williams met Smith, whom she knew as Mitchell's girlfriend, when Williams began living with Johns. Williams testified that while she was in the county jail after having gotten into "[a] major argument" with Johns, Smith was also being housed there, and they were both "staying in the same area." Williams heard Smith tell others "why she was in jail" while they were "all sitting eating." Williams overheard Smith say "that her and her boyfriend and some friends were robbing houses, and that it was kind of cool at first until the end. She got caught up." Smith indicated that "it went bad, and she got caught up."

However, when asked whether she had ever had a conversation with Smith about a specific home invasion, Williams was clear that no such conversation had occurred:

> "Q Okay. Now, in – after September 15th did Kiesha Smith braid your hair?
>
> "A I don't know the dates, but I do remember her braiding my hair once, yes.
>
> "Q Do you have any discussions – was there any discussions during the time that your hair was being braided concerning any incident where Miss Smith was supposedly involved in any burglaries?
>
> "A No.
>
> "Q Okay. So if Miss Johns indicated that you were getting your hair braided and that Kiesha and you were having a discussion about a burglary ultimately that ended in a death, would that be true or untrue?
>
> "A That would be false. We never had a discussion.

49

"Q    So it is your testimony today that if Miss Johns testified to a long discussion between yourself and Miss Smith that she ultimately came into, would that be true or untrue?

"A    That would be false.

"Q    Okay. Now, if you would have had information concerning that would you have stayed living in that house?

"A    Heck, no. No. I wouldn't. I would have been gone."[31]

Williams did not have the credibility issues that Johns presented. For example, there is nothing to indicate that Williams was biased either for or against Smith or Mitchell. She provided other incriminating details about Smith of which she had become aware, including statements that she attributed to Smith on at least one other occasion, but she unequivocally denied having had a conversation with Smith about one particular home burglary, as Johns had related during her police interview.

It is well understood that the "focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration." (*People v. Frierson* (1991) 53 Cal.3d 730, 745.) Given the significant questions regarding the reliability of Johns's statements about Smith's purported statements to Williams—statements that focus blame on Mitchell, we conclude that the statements lacked sufficient indicia of reliability to render them admissible against Mitchell.

---

[31]    Williams was living at Johns's home when police executed a search warrant at the home. She moved out immediately after the day of the search of the home. She indicated that she was "kind of taken aback when the police came to the house," so she "went to Texas to go stay with [her] mom," where she stayed for two or three weeks.

50

ii.    *The evidence of Smith's statements to Lott*

We next consider Smith's statements to Lott. It is clear that these statements were also attempts to shift blame to others, including Mitchell, and away from Smith. Again, although the statements may be facially inculpatory, in that Smith placed herself at the scene of the crime, her comments were clear attempts to minimize her role and to place blame for any injury to the victim on Mitchell and another individual. According to Lott, Smith said that "*they*" put a pillowcase over the woman's head, and then "proceeded to beat her," while Smith "was trying to get *them* to stop." (Italics added.) Smith specifically said that her "boyfriend" put the pillowcase over the woman's head, and "[t]he cousin" was the one who tied the victim up. According to Lott, Smith also said that she urged the group to leave, saying "[L]et's go, let's go." Like the statements attributed to Smith by Johns, these statements purportedly made by Smith to Lott (or overheard by Lott) were not specifically disserving to Smith, and therefore, cannot be considered to have been declarations against Smith's interest.

We conclude that the trial court erred in finding that the entirety of Smith's purported statements to other individuals were all statements against *Smith's* interest, and that the court abused its discretion in admitting these statements in their entirety against Mitchell, including those portions in which Smith specifically shifted blame away from herself and onto Mitchell.

51

iii.	*The erroneous admission of these statements was prejudicial*

Given our conclusion that the trial court should not have admitted all of these statements in evidence against Mitchell, we must assess any prejudice that may have flowed from the erroneous admission of these statements.

The standard applicable to state law error in the admission of hearsay is the standard announced in *Watson*, *supra*, 46 Cal.2d at pages 836-837, a standard we previously set forth in part III.A.1.b., *ante*. We conclude that the error in permitting the prosecution to introduce Smith's statements that were not specifically self-disserving in the trial against Mitchell was prejudicial under the *Watson* standard. Specifically, there is a reasonable probability that the outcome of Mitchell's trial would have been different if the trial court had excluded the erroneously admitted hearsay statements.

Without Smith's hearsay statements about what occurred inside the Hassett residence, the prosecution's case against Mitchell was entirely circumstantial and fairly weak. There was no physical or other forensic evidence indicating that the defendants were ever present inside the Hassett residence. Other than Smith's hearsay statements, the only other significant evidence that linked Mitchell to the Hassett residence was Beck's testimony, and Beck's value as a witness was highly questionable. Beck was herself implicated in the crime. She admitted that she "took the deal" from the prosecution so that she "wouldn't get prosecuted for murder."

Further, Beck, the prosecution's star witness and the person on whom the prosecution relied for the bulk of their evidence implicating Smith and Mitchell, had difficulty identifying Mitchell in photographic lineups, despite claiming that the group had planned the crime together and that Mitchell had pointed a gun at her. Beck could not remember what time she had been at the Hassett residence on the day Kelley was killed, and her testimony about a variety of details surrounding the incident were inconsistent, at best. Further, Beck was unable to provide any information as to what actually occurred inside the house. She said that she was not present "when the incident occurred," and conceded that she had no idea "what happened to Derrick's grandmother" because she "wasn't there." Therefore, absent Smith's statements about Mitchell, there was a dearth of evidence placing the defendants at the Hassett residence, and, indeed, there was no evidence as to what happened in the residence that day.

Further, there were a number of other people who were admittedly in the Hassett home on the day of the robbery—i.e., there were a number of third parties who could have played some role in the burglary and killing of Kelley. In fact, the police initially suspected at least one other person of committing this crime—Derrick Hassett.

As should be clear, the prosecution's case against Mitchell relied *heavily* on Smith's statements inculpating Mitchell and herself in the burglary and Kelley's death. In light of the foregoing, particularly the absence of any eyewitnesses to the burglary and the lack of physical evidence linking Mitchell to the crime, we conclude that it is

53

"reasonably probable that a result more favorable to defendant would have been reached" (*Watso*n, *supra*, 46 Cal.2d at p. 837) if the trial court had not erred in admitting Johns's and Lott's testimony relating the full extent of Smith's hearsay statements, including portions of those statements that were not wholly disserving of Smith's own interests and shifted blame to Mitchell.

2.      *Mitchell's other claims of error*

Because we reverse Mitchell's first degree murder conviction on the ground that certain evidence was erroneously admitted against him at trial, we need not address his other contentions on appeal, including his arguments that:  (1) the trial court erred in failing to sua sponte instruct the jury that Derrick Hassett's silence in the face of statements made to him could be construed as an adoptive admission and/or that his trial counsel was ineffective in failing to request such an instruction; (2) the trial court erred in permitting the prosecutor to inform the jury that Beck's plea agreement required her to testify truthfully, and that the court would determine whether she met this requirement, since it suggested to the jury that if Beck was permitted to testify fully at trial, then the court must have believed Beck's testimony; (3) his trial counsel provided ineffective assistance in failing to impeach Amay Lott's testimony that she was cellmates with Smith or to mention the inconsistency to the jury, given the existence of evidence that the two were not cellmates; and (4) the cumulative effect of these errors deprived him of a fair trial.

## IV.

## DISPOSITION

The judgments against Smith and Mitchell are reversed.  The matter is remanded to the trial court for retrial.

AARON, J.

I CONCUR:

McDONALD, J.

BENKE, Acting P.J., Concurring and Dissenting.

I dissent in part.

I agree with the majority that Smith's conviction must be reversed.  The version of CALCRIM No. 301 the trial court provided Smith's jury was erroneous and conflicted with the version of CALCRIM No. 334 the trial court also provided Smith's jury.  I agree the record shows these contradictory instructions prejudiced Smith.

I disagree with the majority's disposition of Mitchell's appeal.  The trial court did not abuse its discretion in admitting either Smith's statements to Williams or her statements to Lott.  Our state's jurisprudence with respect to the admission of statements against penal interest under the exception to the hearsay rule set forth in Evidence Code section 1230, does not, as suggested by the majority opinion, inevitably prevent admission of such statements when the declarant's statements paint the declarant in a more favorable light than the criminal defendant who is the subject of the declarant's statement.  Under the majority's narrow and novel interpretation of the penal interest exception, such a statement would be admissible only in those rare instances where the declarant has assumed the bulk of responsibility for a crime.  This limitation on the use of such statements is unprecedented and inconsistent with the prevailing principle that admission of hearsay statements which inculpate both the declarant and a criminal defendant is left to the sound discretion of the trial court.  In such cases, the trial court is given the task of determining, from the overall context in which a proffered statement has been made, whether it both 1) disserves the interest of the declarant and 2) is otherwise sufficiently reliable to permit its admission.

I also disagree with the majority's analysis of any prejudice Mitchell suffered from admission of Smith's statements.  Although under the *Chapman*[1] standard of prejudice the People would have a difficult time showing that the disputed statements did not influence the jury's verdict, under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837, which governs nonconstitutional errors in the admission of evidence, an appellant must show a reasonable probability that the error negatively affected the verdict.  Given the circumstantial and testimonial evidence that connected Mitchell to Kelley's murder, Mitchell cannot meet the higher bar that *Watson* dictates we apply here.  I would not, as the majority have done, engage in what is little more than a sub rosa *Chapman* analysis of prejudice.

A.  Evidence Code Section 1230

1.  *Specifically Disserving Declarant's Interest*

In *People v. Spriggs* (1964) 60 Cal.2d 868, 875 (*Spriggs*), California became one of a minority of jurisdictions that permit admission of hearsay statements that are contrary to a declarant's penal interest.  The holding in *Spriggs* was later codified by the Legislature in its adoption of Evidence Code section 1230.[2]  In *People v. Leach* (1975)

---

[1]     *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

[2]     Evidence Code section 1230 provides:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social

2

15 Cal.3d 419 (*Leach*), the court expressly limited the exception created by Evidence Code section 1230 to statements and portions of statements that are "specifically disserving to the interests of the declarant." (*Leach*, at p. 441, fn. omitted.) The court did so because the rationale for the exception—that statements which implicate the declarant in a crime are likely truthful and therefore reliable—does not apply to statements or portions of statements that do not specifically implicate the declarant. (*Id.* at pp. 439-441.)

In *Leach*, the trial court permitted fairly extensive incriminating statements two defendants made about themselves and each other to be admitted against both of them. Significant portions of each defendants' respective statements did not specifically incriminate themselves, but rather only incriminated the other defendant. (See *Leach*, *supra*, 15 Cal.3d at pp. 424-427.) Because those portions of the statements that did not specifically inculpate the respective declarant might have been made without regard to whether they were true, the court found that admission of those statements was erroneous. (*Id.* at p. 442.)

However, following *Leach*, our courts have elaborated on the requirement that statements be disserving and found that, in a number of instances, statements that inculpate both the declarant *and* the defendant are admissible. In *People v. Wilson* (1993) 17 Cal.App.4th 271 (*Wilson*), the defendant was convicted of two counts of attempted voluntary manslaughter based in part on statements his wife made to police in which she

_____

disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

3

stated that following the attempted homicides, her husband instructed her to retrieve from a tree near their residence the gun he had used in the attempted homicides and take it to her mother's house; the wife further stated she had done as instructed.  Although the statement implicated the defendant in a more serious offense, the court found the statement specifically disserved the wife's interest because it showed she was an accessory to the offense as defined by Penal Code section 32.  (*Wilson*, at pp. 275-277.) "The fact that the statement is also disserving to [the nondeclarant] does not render the statement unreliable and inadmissible."  (*Ibid.*)

Relying on *Wilson*, in *People v. Gordon* (1990) 50 Cal.3d 1223, 1252-1253 (*Gordon*), the Supreme Court reached a similar conclusion with respect to an accessory, Rauch, who told law enforcement officers that he had provided the defendant, his nephew, with shelter and medical care after the defendant had been wounded in a robbery.  "The court could have reasonably concluded that at the time it was made, Rauch's statement so far subjected him to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true.  This is because Rauch all but confessed that he was an accessory to the crimes committed in the Riverside K mart incident . . . .  To be sure, Rauch did not *expressly* admit either intent or knowledge.  But he impliedly admitted both by his suspicious conduct throughout the incident in question.  [¶]  Defendant argues to the contrary.  He claims Rauch's statement should be considered untrustworthy in view of its substance.  He says it must be characterized as neutral or exculpatory, and therefore unreliable, because it admits no more than it does.  We cannot so characterize the statement.  To be sure, *the criminal*

4

*liability that the statement risks is not the highest. But it is significant nonetheless*." (*Id.* at p. 1252, second italics added.)

In *People v. Samuels* (2005) 36 Cal.4th 96 (*Samuels*), a paid murderer told his friend that he had killed the victim, that the defendant had paid him and that he had paid some of the money to a third person who helped him. Again, expressly relying on *Wilson*, the court rejected the defendant's contention that those portions of the murderer's statements that implicated her were collateral and did not directly disserve the murderer's interest. The court stated: "Under the totality of the circumstances presented here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the friend's] recollection of [the murderer's] precise comments to him. Instead the reference was inextricably tied to and part of the specific statement against penal interest." (*Id.* at p. 121.)

In *People v. Greenberger* (1997) 58 Cal.App.4th 298 (*Greenberger*), a declarant had been the driver in a kidnapping and murder for hire in which his codefendant had been a principal actor. In discussing the concerns that arise when a declarant's statement inculpates both the declarant and a defendant, the court stated: "When examining what was actually said by the declarant special attention must be paid to any statements that tend to inculpate the nondeclarant. This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is least reliable in that portion which shifts responsibility. Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another . . . . This is not to

5

say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances." (*Id.* at p. 335.) Thus, the question of whether a statement disserves a declarant's interest is not to be determined solely on the basis of the face of the statement but in light of the circumstances under which it was made: "Even a hearsay statement that is facially inculpatory of the declarant may, when considered in context, *also* be exculpatory or have a net exculpatory effect. . . . '[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context.' " (*People v. Duarte* (2000) 24 Cal.4th 603, 612 (*Duarte*).)

In *Greenberger*, although the declarant's statements described his role as only the driver and smaller than his codefendant's, the statements were nonetheless sufficiently disserving of the declarant's penal interest that "a reasonable person in [the declarant's] position would not have made them unless he believed them to be true." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 337.)

In contrast, in *Duarte*, the court found that in the context of questioning by law enforcement officers following his arrest, the declarant's self-serving statements in which he stated he had no intention of hurting anyone, were not disserving. (*Duarte*, *supra*, 24 Cal.4th at pp. 613-614.)

### 2. *Trustworthiness*

Although as a threshold matter only statements that are specifically a disservice to the declarant may be admitted, the statements must also be made under circumstances

which show that they are trustworthy. (See *Duarte*, *supra*, 24 Cal.4th at p. 614; see also *Greenberger*, *supra*, 58 Cal.App.4th at p. 337.) Stated another way, even when statements are disserving to the declarant, they may still be excluded if nonetheless they have been made under circumstances which undermine their reliability. This requirement arises as a means of satisfying the confrontation clause of the Sixth Amendment to the United States Constitution. (See *Greenberger*, at pp. 334-332; see also *Wilson*, *supra*, 17 Cal.App.4th at p. 277.) In determining trustworthiness, "[t]he trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*Greenberger*, at p. 334.) As the majority recognize, "[c]learly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. 'Once partners in crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.' [Citation.] However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Id.* at p. 335.)

In *Greenberger*, even though the driver/declarant's statement minimized his own role and attributed to his codefendant a murder in which other defendants shot the victim 13 times, because the statements were made in an informal setting in which the driver/declarant had been drinking with an undercover police informant, the court found that the "circumstances of the conversation provided sufficient indicia of reliability to

7

ensure that the statements were trustworthy." (*Greenberger, supra*, 58 Cal.App.4th at p. 337.)

### 3. *Application*

The cases that have considered Evidence Code section 1230 make clear the fact that a hearsay statement portrays the declarant as a more minimal participant in a crime by itself does not require exclusion or end our analysis. The statements at issue in *Wilson*, *Gordon* and *Greenberger* each portrayed a defendant as far more culpable than the respective declarants; nonetheless, in each instance, the trial court concluded the statements both specifically disserved the declarant's interest and were made under circumstances that suggested they were reliable, and, in each instance, the trial court's determination was upheld. (See *Wilson*, *supra*, 17 Cal.App.4th at pp. 276-277; *Gordon*, *supra*, 50 Cal.3d at pp. 1252-1253; and *Greenberger*, *supra*, 58 Cal.App.4th at p. 337.) Only when there is both blame shifting by the declarant and other circumstances suggest some improper motive for the blame shifting have courts found admission of a hearsay statement error. (See *Duarte*, *supra*, 24 Cal.4th at pp. 612-614.)

### B. Analysis

#### 1. *Smith's Statements to Williams*

##### a. <u>Disserving Interest</u>

The statements Smith made to Williams, which Johns told police she overheard, clearly disserved her penal interest. The statements put her at the scene of a burglary, robbery and murder. In particular, the references Smith made to Mitchell in the statement plainly disserved her penal interest because they showed that she was not only at the

8

scene of the crimes, but that she was there to assist Mitchell and was willing to follow his directions. Given the facts that Smith related to Williams, her statements, although they portrayed her as the more passive participant, disserved her penal interest in a manner indistinguishable from the statements considered in *Wilson*, *Gordon* and *Greenberger.* As I have noted, there, as here, the declarants' respective inculpatory statements about themselves were inextricably intertwined with statements that placed more responsibility on the nondeclarant defendants and were, as here, directly disserving as required by *Leach*.

### b. Reliability

Admittedly, the reliability of the statements Johns overheard is worthy of careful analysis. Looking only at the version Johns initially provided police, the circumstances of Smith's statements give the statements a great deal of reliability. The statements were informal and made to a friend in a setting in which there was no apparent reason to dissemble or exaggerate.

The circumstances which, of course, call Johns's initial version of Smith's statement into question are Johns's later recantation and Williams's contradiction of Johns's initial version. Unlike my colleagues, I have no difficulty in relying on the trial court's resolution of this evidentiary conflict. At the time the police took the statement from Johns, it had very powerful indicia of reliability: The statement implicated Johns's son in a homicide, Johns provided the statement in apparent spontaneous reaction to a news story, and it included details that the police had not previously disclosed. The trial court, and eventually the jury, could easily discount Johns's later recantation as motivated

9

by her reconsideration of the seriousness of her son's situation and Williams's memory of one conversation about the crime and not another to both passage of time and animosity toward Johns. In short, on this record, while a finding that Johns's initial version of Smith's statement was unreliable would certainly have been rational, so was the trial court's finding of reliability. Thus, there is no basis on which to find that the trial court abused its discretion in admitting evidence of Johns's initial version of Smith's statement.

The circumstances here are in marked contrast to the statements considered in *Duarte*. There, the declarant was being questioned by police and made statements about the defendant that did not directly inculpate the declarant. Statements that did not disserve the declarant and were made in a context in which the declarant had obvious motives to shift blame to the nondeclarant do not fall within Evidence Code section 1230. However, because the record in *Duarte* is so different from the record here, it does not in any sense undermine the trial court's admission of evidence of Smith's statements to Williams.

2. *Smith's Statements to Cota*

a. Disserving Interest

Like the statements Johns overheard, the statements Cota overheard Smith make to Williams and the statements Smith made to Cota herself were plainly disserving to Smith's interest. Again, they put Smith at the scene of the burglary, robbery and murder, helping Mitchell. The fact that, in the statements, Smith describes her attempts to dissuade Mitchell and a third person from putting a bag over Kelley's head and beating her, does not make the references to Mitchell less reliable or inadmissible; the portions

10

that make Mitchell more aggressive were, like the statement's Johns heard, inextricably intertwined with the fact that in admitting that she witnessed the crime and helped the other perpetrators, Smith was inculpating herself. (See *Samuels*, *supra*, 36 Cal.4th at p. 421.) As in *Greenberger*, a reasonable person in Smith's position would not have made the statements unless she believed them to be true. (See *Greenberger*, *supra*, 58 Cal.App.4th at p. 337.)

### b. Reliability

When Cota heard Smith's statements, neither she nor Williams were in any position to either coerce Smith or reward her for divulging information about herself or Mitchell. In that context, Smith had no very real motive to exaggerate Mitchell's role in the burglary and murder. Also, there does not appear to be anything in the record that suggests Cota had any motive for inventing the statement or embellishing it in a manner in which Mitchell's role in the crime was amplified.

Thus, again there is no basis on which to find the trial court abused its discretion in admitting Cota's testimony in which she related her recollection of Smith's statements. Again, the circumstances here are in marked contrast to the statements considered in *Duarte*. Unlike the record in *Duarte*, the statements Cota heard disserved Smith's interests and were not made in a context in which the declarant had obvious motives to shift blame to the nondeclarant, and, therefore, they fell within Evidence Code section 1230.

In the end, my chief departure from the majority's opinion is in what I believe is its failure to property analyze both the face of the statements at issue and the context in

11

which they were made. As I have indicated, our Evidence Code section 1230 analysis does not exclude all statements in which a defendant is portrayed more harshly than the declarant; rather, the cases have consistently gone further and also considered whether the context in which such statements were made make them unreliable. In this regard, in considering both questions we should be mindful of the fundamental limitation on our power to review a trial court's exercise of discretion. As the court in *Gordon* noted, the fact a record might have permitted exclusion of a statement, "simply does *not* show that a court was unable to arrive at the opposite conclusion" and therefore "does not establish an abuse of discretion." (*Gordon*, *supra*, 50 Cal.3d at p. 1253.)

C. Prejudice

Although I do not believe the trial court abused its discretion in admitting Smith's statements, even if there was an abuse of discretion, I do not believe that reversal of Mitchell's conviction is warranted.

There is no dispute that Kelley died at the hands of another. Moreover, there is no dispute that Smith and Mitchell pawned items taken from Kelley's house and that other items taken from the Hassett home were found at the Johns home, where Smith resided. These facts alone raise a reasonable inference that Smith and Mitchell participated in the burglary, robbery and murder. Contrary to the majority's conclusion, those items are physical evidence that tie Mitchell to the crime. Moreover, contrary to the majority's conclusion, there was evidence of what occurred in the Hassett home: Kelley was found bound and gagged, and a number of valuable items were taken from the home and eventually pawned by Smith and Mitchell. Derrick had a fairly ironclad alibi, and,

12

importantly, Beck's testimony plainly implicated both Smith and Mitchell.  Under these circumstances, even in the absence of Smith's statements, I think a jury was more likely than not to have rejected Mitchell's version of events, in which Derrick was the likely killer of his grandmother, and find Mitchell responsible.  No more is required under *Watson*, which the majority agree applies here.

Under *Chapman*, I would agree reversal would be required.  In light of the incriminating nature of Smith's statements, there would be some doubt in my mind about the impact of any error in admitting those statements on a jury.  However, that is not our task under *Watson*, which places the burden on appellant to show that any error was likely to have caused harm.  (*Watson*, *supra*, 46 Cal.2d at p. 837.)  On this record, Mitchell cannot meet that burden.

I find unpersuasive Mitchell's other claims of error.  Accordingly, I would affirm Mitchell's conviction.


BENKE, Acting P. J.


13